Case 1:16-cv-01351-LDH-PK    Document 20-5    Filed 07/14/17    Page 1 of 35 PageID #: 650

# Exhibit B

**Confidential and Proprietary**

# AGREEMENT

THIS AGREEMENT (the "Agreement") is made effective as of January 1, 2010, (the "Effective Date") between STATEN ISLAND UNIVERSITY HOSPITAL (the "Hospital") a New York corporation with offices at 475 Seaview Avenue, Staten Island, New York 10305 and MORRISON MANAGEMENT SPECIALISTS, INC. a Georgia corporation ("Morrison"), with offices located at 5801 Peachtree Dunwoody Road, Atlanta, Georgia 30342.

The Hospital desires to have Morrison operate and manage the Hospital's food and nutrition services operation at the Hospital's North Site (located at 475 Seaview Avenue, Staten Island, New York 10305) and the Hospital's South Site (located at 375 Sequine Avenue, Staten Island, New York 10309) and provide Services as described in this Agreement. In consideration of the premises and covenants herein, the parties mutually agree as follows:

## ARTICLE 1 - SERVICES

**1.1 Engagement.** (a) Subject to paragraph 1.1(b), the Hospital agrees to retain Morrison to exclusively provide the Services for the Hospital's food services program (the "Program") and Food and Nutrition Services Department (the "Department") at the Hospital's North Site and South Site, and Morrison agrees to provide the Services on the Hospital's behalf as the Hospital's agent.

(b) The parties understand and agree that Morrison's exclusive right to provide the Services shall not apply to the operation of gift shops on the Hospital's premises or to Morrison's catering services.

**1.2 Personnel.** (a) Morrison will furnish management personnel, including dietitians, (the "Management Personnel") to provide the Services on-site at the Facility. Morrison shall pay the Management Personnel and bill Hospital for salaries and costs of the Management Personnel, including Morrison's Management Percentage Rate which is initially established at 42.53%. Notwithstanding the foregoing, Morrison will not charge the Hospital for any incentive pay to be paid by Morrison to the Management Personnel. The Hospital may request removal of any Morrison Management Personnel and Morrison will comply, provided such request is lawful, reasonably justified in writing, and Morrison is first given an opportunity to respond and address such issues consistent with this Agreement.

(b) Unless otherwise agreed, all hourly personnel of the Program and the Department who work at the Facility (the "Hourly Personnel") will be carried as part of the Hospital's payroll, and all expenses in connection with the Hourly Personnel shall be paid by the Hospital. The Hospital shall be responsible for all costs related to the Hourly Personnel, including all wages and associated payroll costs such as payroll taxes, insurance and fringe benefits.

(c) Morrison personnel shall follow the Hospital's applicable policies and procedures, which will be provided to Morrison by the Hospital (including updates to such policies and procedures as may occur from time to time).

(d) Morrison personnel will comply with the Hospital's training requirements, including, but not limited to, the Hospital's annual corporate compliance training and coding and documentation training.

**1.3 Purchasing.** (a) Responsibilities for paying vendors directly for the following items are indicated below (M = Morrison; H = Hospital). Purchases by Morrison will be billed to Hospital per Article 2.

Morrison/Program          Hospital

1

**Confidential and Proprietary**

| Item | M | H |
|---|---|---|
| Food | M | |
| Office supplies/stationery | M | |
| In-service training materials/supplies | M | |
| Telephone service | | H |
| Telephone long distance | | H |
| Laundry | M | |
| Cleaning/dishwashing supplies | M | |
| Menu paper and print | M | |
| Copying | | H |
| Kitchen paper/plastic | M | |
| Marketing/merchandising materials for operation | M | |
| Patient education materials/guides | M | |
| Business licenses and permits | | H |
| | | |
| Computer hardware/printer paper (provided by Morrison) | M | |
| Computer software (provided by Morrison) | M | |
| Computer related charges (provided by Morrison) | M | |
| Utilities | | H |
| Pest control | | H |
| Employee physicals and testing for Morrison employees | | H |
| Employee physicals and testing for Hospital employees | | H |
| Background checks and drug screenings for Morrison employees | M | |
| Background checks and drug screenings for Hospital employees | | H |
| Garbage/trash removal | | H |
| Service contracts (on-going) | | H |
| Repairs - purchased services (as occurs) | M | |
| Rented/leased equipment | M | |
| Tablewares/Smallwares replacement | M | |
| Minor equipment replacement (less than $500) | M | |
| Major equipment replacement ($500 or more) | | H |
| Postage | M | |
| Uniforms | | H |
| Armored car service | | H |
| Bank Card Charges | | H |
| Parking | Not applicable | |

(b)    Until full reimbursement, title to the above items shall remain with the party who pays the vendor directly.  Notwithstanding anything to the contrary, all computer hardware and software furnished by or through Morrison, as well as any of Morrison's Proprietary Information, shall remain the property of Morrison (even if fully depreciated).  Hospital will provide high speed/broadband internet access to Morrison at no cost to Morrison in offices and at retail point of sale locations for Morrison's use in the Department.

(c)    Morrison will determine the specifications for and order food to be used in the Department at the Facility.  Morrison shall utilize the Hospital's group purchasing program for the purchase of food items; however, if one of the following exceptions applies, then Morrison will have the option to purchase food items through Morrison's national account or other vendor systems:  (1) the food items are proprietary to Morrison; or (2) the Hospital's group purchasing vendors do not have food items that meet Morrison's specifications available.  If Morrison utilizes its national account or other vendor systems, then the Hospital will receive the same price savings as Morrison's other clients.  Subject to paragraph 1.3(d), the Hospital will be entitled to retain any early payment discounts, rebates, administrative fees or volume discounts that the Hospital is entitled to receive through its group purchasing program.  If vendors extend to Morrison any company-wide credits, fees or discounts, including, without limitation, any early payment discounts, administrative fees or volume discounts, Morrison will be entitled to retain such credits, fees or discounts.  Purchasing will be reviewed by the parties on a quarterly basis.

2

**Confidential and Proprietary**

(d)   The Hospital may be entitled to receive rebates from the Hospital's group purchasing organization (GPO) based on early payment of invoices.  The Hospital agrees that Morrison will be entitled to receive any rebates that are triggered by any early payments that Morrison makes to a vendor who is part of the Hospital's group purchasing program.

(e)  Morrison agrees to pay the Hospital's GPO vendors timely.  If Morrison fails to pay a Hospital GPO vendor timely, then Morrison will reimburse the Hospital for any reduction in rebates that is caused by Morrison's failure to pay timely.

1.4  **Hospital Facilities**.  (a)  The Hospital will furnish a Facility that is equipped and furnished to the reasonable satisfaction of Morrison and the Hospital.  The Hospital will ensure that the Facility (including the kitchen) is in good, clean, sanitary, working condition, as of the beginning of Morrison's Services.  The Hospital will maintain the Facility and all items furnished by the Hospital (the "Property") in accordance with Applicable Law, and make all repairs or replacements to the Facility and Property at its expense, except that Morrison shall be responsible for damage to the same caused by the gross negligence of Morrison's employees (other than as provided in Section 6.4).

(b) Cleaning responsibilities will be as follows (M  = responsibility of Program managed by Morrison; H  = responsibility of Hospital, not Morrison managed):

| | Morrison/Program | Hospital |
|---|---|---|
| Floors | M | |
| Walls | M | |
| Equipment | M | |
| Refrigerators and freezers | M | |
| Exterior of Vents | M | |
| Interior of Vents | | H |
| Ceiling | | H |
| Duct work | | H |
| Light replacement | | H |
| Floors | M | |
| Walls | M | |
| Ceiling | M | |
| Shelving | M | |
| Serving line/equipment | M | |
| Serving line walls | M | |
| Serving line floors (customer side) daily sweeping and mopping) | M | |
| Serving line floors (customer side) all other, including heavy cleaning/scrubbing/waxing | | H |
| Serving line floors(kitchen side) | M | |
| Ceiling | M | |
| Furniture | M | |
| Equipment | M | |
| Floors/carpet | | H |
| Windows/walls | | H |
| Ceiling | | H |
| Drapery | n/a | n/a |
| Equipment And countertop wipe | M | |

3

**Confidential and Proprietary**

| down | | |
|---|---|---|
| Floors | | H |
| Walls/ceilings | | H |
| ▓▓▓▓▓▓▓▓▓▓ | | |
| Pick-up/spot mop | M | |
| Daily cleaning | | H |
| ▓▓▓▓▓▓▓▓▓▓ | | |
| Daily cleaning of floors and surrounding areas | | H |

 1.5 **Inventories**. (a) The Hospital will provide and maintain a fully adequate initial inventory and supply of Tablewares and Smallwares for satisfactory operating requirements, in Morrison's opinion, at the Hospital's expense. Morrison will be responsible for providing replacement Tablewares and Smallwares due to loss or breakage. Morrison will charge the Hospital for the Tablewares and Smallwares furnished by Morrison.

 (b) Each party will retain ownership of the items they provide, until full reimbursement/payment of all amounts under this Agreement.

 (c) The parties will also jointly prepare an inventory of food and dietary supplies of the Hospital with a dollar value based upon then current purchase prices (the "Beginning Inventory"). Upon termination of this Agreement, the parties will jointly prepare an ending inventory of such food and dietary supplies with a dollar value based upon then current purchase prices (the "Ending Inventory"). If the aggregate value of the Ending Inventory is less than the Beginning Inventory, Morrison shall credit the Hospital for the difference. If the aggregate value of the Ending Inventory is greater than the Beginning Inventory, Morrison shall charge the Hospital for the difference. Items that are not in usable or sellable conditions will be excluded from the Beginning and Ending Inventories.

 (d) Morrison will charge the Hospital for food and supplies based on the amount of inventory used by Morrison for the month being billed.

 1.6 **Meetings**. In order to improve communication and effectiveness, the parties agree to meet at mutually agreeable times and places to discuss performance and expectations under this Agreement. This includes having an initial transition and expectation meeting(s) prior to the start of Morrison's services and subsequent meetings at least annually, with participation by appropriate senior management of each party who have decision making authority.

 1.7 **Quality Assurance**. Morrison will implement a quality assurance program. Certain parameters regarding the quality assurance program are set forth in Exhibit A.

 1.8 **Morrison Programs.**_Morrison has agreed to implement the Morrison programs set forth in Exhibit B.

## ARTICLE 2 - COMPENSATION

 2.1 **Billing**. (a) The Hospital will pay Morrison for the Services in accordance with weekly invoices submitted by Morrison, which will reflect amounts due and adjustments from prior billings. Payments are due within thirty (30) days of billing and shall be paid by check on or before the 30th day to a bank account designated by Morrison in Morrison's name; any sums unpaid thereafter shall bear interest at the lesser of one percent (1%) per month or the highest rate permitted under Applicable Law, accruing from the date of billing to the date of payment.

**Confidential and Proprietary**

(b)  A sample bill is attached hereto as Exhibit C for informational purposes only.  In the event of a conflict between the terms of this Agreement and the sample bill, the terms of this Agreement will control.

(c)  Morrison will provide documentation as reasonably requested by the Hospital that supports and verifies the accuracy of Morrison's charges to the Hospital.  Morrison will also provide documentation as reasonably requested by the Hospital so that the Hospital can confirm that any commissions to be paid by Morrison in connection with Morrison's vending and Outtakes® operations are correct.

2.2  **Management Fee.**  The Hospital further agrees to pay Morrison as follows:

(a)  Morrison shall be allowed to charge and receive $68,000 annually as a management fee and $171,200 as a general and administrative charge, all payable in equal, consecutive weekly installments.

(b)  The charges outlined above will increase annually corresponding to an increase that is mutually agreed upon by the parties.

(c)  The Hospital shall bear all costs and any losses in connection with the operation of the Department, including but not limited to payroll costs, Morrison's fees and charges, and all food, labor, supply and other standard costs.  Nothing contained in this Agreement shall be construed as a representation or guarantee by Morrison that any financial, budgetary, performance or other goals will be met with the exception of the financial incentive plan (see paragraph 2.6 and Exhibit D) and the patient satisfaction incentive plan (see paragraph 2.7).

2.3  **Opening Costs.**  Morrison has estimated that it will incur at least $132,191 in opening costs. This amount represents a portion of Morrison's opening costs such as employee relocation and instructional expenses.  Morrison has agreed that it will not charge Morrison's opening costs to the Hospital.  However, if this Agreement is terminated prior to December 31, 2016, then Morrison will be entitled to charge the Hospital for a prorated portion of Morrison's opening costs. Morrison will provide a final accounting of the opening expenses once completed. For purposes of this provision the amount to be charged will be the actual expenses or $131,191 whichever is lower. In no case will the amount charged to Hospital exceed $131,191.  The amount to be charged will be equal to the actual expenses or 131,191 (whichever is lower) multiplied by a fraction, the denominator of which is 84 and the numerator of which is the number of full months remaining between the date of termination and December 31, 2016.

2.4  **Cash Received.**  Any cash sales received from the Program will be collected by Hospital and delivered to the Hospital's business office.

2.5  **Investments.**  (a)  Morrison agrees to make available the sum of up to $685,000 for investment ("Investment") in renovations, capital equipment and improvements (the "Improvements") in connection with the implementation of Morrison's Catering to You® patient service program, the implementation of Morrison's retail programs, and the purchase of a dishwashing system.  The Improvements shall be made and located as mutually agreed upon.  All such Improvements may be removed or replaced with the parties' approval, and the Investment shall be amortized/depreciated monthly by straightline method from the date(s) such Investment funds are used to no later than December 31, 2016 (or a shorter period of time if required by generally accepted accounting principles). The monthly amount of the amortization/depreciation will be based on Morrison's then current accounting period used by Morrison's parent company (Compass Group USA, Inc.).  Morrison has agreed to bear the cost of the Investment.  However, the Hospital agrees to pay Morrison immediately the full unamortized/undepreciated value of the Investment plus interest at the "Prime" rate plus 1%, compounded, on the unamortized/undepreciated amount of the Investment calculated from the date of such Investment or purchase of the equipment if this Agreement is terminated for any reason prior to full

5

**Confidential and Proprietary**

amortization/depreciation of the Improvements then on-site.    Morrison shall initially retain title to the Improvements.  Title to the Improvements shall pass to Hospital after full amortization/depreciation of the Investment, or, if this Agreement is terminated prior to full amortization/depreciation, after payment to Morrison of all amounts owed under this paragraph.  The "Prime" rate for such calculations will be determined at the date of such Investment or purchase of the equipment and will be as published by the Wall Street Journal.  The Hospital, not Morrison, will be responsible for costs incurred in connection with the Investment or Improvements due to delays or costs that are incurred due to circumstances beyond Morrison's control, including, but not limited to, force majeure events; delays in the permitting process; or the existence of hidden, latent and/or unknown problems such as the discovery of asbestos or other hazardous materials.

(b)  Morrison also agrees to make available the sum of up to $600,000 for additional investment ("Additional Investment") in retail area renovations, capital equipment and improvements (the "Additional Improvements") as mutually agreed upon by the parties.  Morrison will make the Additional Investment funds available to the Hospital through a check made payable to the Hospital within thirty (30) days of the Effective Date.  The Additional Improvements shall be made and located as mutually agreed upon, and the Hospital agrees that the Additional Investment funds will only be used for Additional Improvements to the Department that have been approved by Morrison.  The Hospital will not use the Additional Investment funds for any other reason.  All such Additional Improvements may be removed or replaced with the parties' approval, and the Additional Investment shall be amortized/depreciated weekly by straightline method from the date(s) such Additional Investment funds are used to no later than December 31, 2016 (or a shorter period of time if required by generally accepted accounting principles).  The weekly amount of the amortization/depreciation will be based on Morrison's then current accounting period used by Morrison's parent company (Compass Group USA, Inc.).  The cost of the Additional Investment will be charged to the Hospital on a weekly basis based on the weekly amount of the amortization/depreciation related to the Additional Investment.  The Hospital agrees to pay Morrison immediately the full unamortized/undepreciated value of the Additional Investment plus interest at the "Prime" rate plus 1%, compounded, on the unamortized/undepreciated amount of the Additional Investment calculated from the date of such Additional Investment or purchase of the equipment if this Agreement is terminated for any reason.    Morrison shall initially retain title to the Additional Improvements.    Title to the Additional Improvements shall pass to Hospital after full amortization/depreciation of the Additional Investment, or, if this Agreement is terminated prior to full amortization/depreciation, after payment to Morrison of all amounts owed under this paragraph.  The "Prime" rate for such calculations will be determined at the date of such Additional Investment or purchase of the equipment and will be as published by the Wall Street Journal.  The Hospital, not Morrison, will be responsible for costs incurred in connection with the Additional Investment or Additional Improvements due to delays or costs that are incurred due to circumstances beyond Morrison's control, including, but not limited to, force majeure events; delays in the permitting process; or the existence of hidden, latent and/or unknown problems such as the discovery of asbestos or other hazardous materials.

(c)  Morrison will provide an amortization/depreciation schedule for the Investment and Additional Investment to the Hospital after the Investment and Additional Investment funds have been used and all of the Improvements and Additional Improvements made.  The amortization/depreciation schedule will identify the approximate amount of the amortization/depreciation on Morrison's books on a monthly basis during the term of this Agreement.

2.6  **Financial Incentive Plan.**  The parties have agreed to the financial incentive plan that is set forth in Exhibit D.

2.7  **Incentive Plans.**  (a)  The parties will mutually agree on a patient satisfaction incentive plan within one hundred twenty (120) days of the Effective Date.  The terms and conditions of the patient satisfaction incentive plan shall be set forth in a written amendment to this Agreement.  Morrison has

6

**Confidential and Proprietary**

agreed to a risk/reward incentive plan whereby Morrison can, earn up to $34,000 during an applicable annual period if Morrison meets or exceeds a mutually agreed upon patient satisfaction benchmark or Morrison may be required to provide a credit on its invoice in an amount of up to $34,000 annually if Morrison fails to meet or exceed the patient satisfaction benchmark. All other terms and conditions of the patient satisfaction incentive plan, including, but not limited to, the applicable benchmark; the commencement date for the plan; and the survey tool and survey questions shall be mutually agreed upon by the parties. The parties have agreed that this patient satisfaction incentive plan shall commence three (3) months after full implementation of Morrison's Catering to You® patient service program (which is projected to be on or around October 1, 2010).

(b)    The parties will compare the Department's score to the applicable patient satisfaction benchmark on an annual basis to determine the amount, if any, that is owed by Morrison to the Hospital for missing the mutually agreed upon patient satisfaction benchmark or owed to Morrison by the Hospital for meeting or exceeding the mutually agreed upon patient satisfaction benchmark.

(c)    The parties will renegotiate the applicable patient satisfaction benchmark for each subsequent twelve (12) month measuring period within thirty (30) days of the end of the previous twelve (12) month measuring period. If this Agreement is terminated prior to the end of a twelve (12) month measuring period, then no charges or credits shall apply during the measuring period in which the termination became effective (or thereafter). If the patient satisfaction survey tool or the patient satisfaction survey questions are changed then no charges or credits pursuant to this plan will apply until a new survey tool/benchmark has been agreed upon.

(d)    The parties will mutually agree in writing by executive an amendment to this Agreement on the implementation of two (2) other incentive plans. The parties have agreed that each incentive plan will have a risk/reward of up to $17,000 per incentive plan.

2.8 **Vending.** (a) Morrison will be responsible for vending services at the Facility. The Hospital understands and agrees that Morrison will have the right to use the services of Compass Group USA, Inc.'s Canteen Vending Services Division in connection with the vending services provided by Morrison. For the purpose of this paragraph 2.8 the term "Morrison" shall mean also mean and refer to Canteen to the extent Canteen is assisting Morrison with the provision of vending services.

(b)    Morrison will provide the vending services on a profit and loss basis whereby Morrison will be entitled to retain all financial profits generated by Morrison's vending operation at the Facility. Morrison will also bear all financial losses generated by Morrison's vending operation at the Facility.

(c)    Morrison shall retain all revenues generated by Morrison's vending operations at the Facility. Morrison shall be responsible for collecting and remitting all sales taxes applicable to Morrison's vending sales.

(d)    Morrison agrees to pay the Hospital a monthly vending commission. The amount of the commission will be equal to 19.2% of net sales from the vending program. "Net sales" shall mean and refer to gross sales from the vending program net of sales or use taxes, returns, spoilage and container deposits. Vending commissions for the North Site will be provided by way of a credit on Morrison's invoice. Vending commissions for the South Site will be provided by way of a check.

(e) Morrison has guaranteed that the minimum annual vending commission to be paid by Morrison to the Hospital during a calendar year shall be $55,000 (this is the combined amount between the North Site and South Site). At the end of each calendar year the parties will calculate the actual amount of the commissions the Hospital has received from Morrison in connection with the vending program. If the total amount of the commissions for the calendar year is less than $55,000, then Morrison will remit the remaining amount to the Hospital within thirty (30) days of the date the commission reconciliation has been

7

**Confidential and Proprietary**

completed (or, in the alternative, Morrison may provide a credit on its invoice for the additional amount owed).

(f)    Morrison shall have the exclusive right to install vending and other related equipment (the "Vending Equipment") to dispense food, beverage, and sundry products (the "Products") at the Facility. Morrison will provide food, beverages, labor and sundry products that are necessary for Morrison to provide the vending services at no cost to the Hospital.  Morrison will install, maintain, and service the Vending Equipment in a sanitary manner in accordance with industry standards and all federal, state, and local laws. The Hospital has no right, title, or interest to the Vending Equipment or Products, and shall not assert or disturb rights, title, or interest to any Vending Equipment, inventory, or other property furnished or installed by Morrison at the Facility.  The Hospital shall not operate, remove, or tamper with such Vending Equipment, Products, or other property. The Hospital shall be responsible for any damage to the Vending Equipment caused by the gross negligence of the Hospital, its agents, or employees.  In the event that a piece of Vending Equipment is not generating an appropriate volume of Net Sales, Morrison may remove such piece of vending equipment.  Morrison will provide the Hospital with at least ten (10) days notice prior to removing the piece of vending equipment.

(e)    The Hospital will furnish Morrison with the necessary space, trash removal, extermination services, and utilities to permit the sanitary operation of the vending services. Morrison will maintain and service the Vending Equipment in a sanitary manner in accordance with industry standards and all federal, state, and local laws. The Hospital will provide Morrison the necessary access (and if required, necessary security access) and sufficient time to properly service and maintain the Vending Equipment.

(f)    Morrison agrees to review its initial vending pricing structure with the Hospital. Morrison will have the right to increase vending prices from time to time.  However, Morrison agrees to provide the Hospital with at least ten (10) days notice prior to increasing prices of vended items.  Morrison will also provide the Hospital with an explanation of the reason for the price increase.

2.9 **Outtakes®.** (a)  As part of its Services, Morrison will operate an Outtakes kiosk (the "Kiosk") at the Hospital's Hearth Tower Lobby on the North Site.  Subject to paragraph 2.9(c), Morrison will operate the Kiosk on a profit and loss basis with Morrison retaining all operating profits and bearing all operating losses incurred by the Kiosk.

(b)  Morrison will provide all food, supplies and labor necessary to operate the Kiosk.  Paragraph 2.2(c) will not apply to the operation of the Kiosk, and the cost of the food, labor and supplies provided by Morrison in connection with the Kiosk will not be charged to the Hospital.

(c)  Morrison will provide a monthly commission to the Hospital by way of a credit on its invoices. The amount of the commission will be seven percent (7%) of net sales.  "Net sales" for the purpose of this paragraph 2.9 shall mean and refer to gross sales less applicable sales or use taxes.

(d)  The Hospital shall provide, at no cost to Morrison, the following items or services in connection with the operation of the Kiosk:  telephone service (local and long distance); high speed/broadband internet access; all utilities (water, electric, HVAC, gas, etc.); grease removal; pest control; garbage/trash removal (Morrison will remove trash from the areas near the Kiosk to the dumpster; the Hospital will be responsible for subsequent waste disposal); repair and replacement of the areas of the Facility where the Kiosk operations take place, including all mechanical, electrical, plumbing, HVAC or other systems necessary for the Kiosk to operate; repairs and replacements of the equipment in the Kiosk and the Kiosk structure.

(e) Morrison will be responsible for cleaning all equipment, shelving and floor space within the confines of the Kiosk and cleaning the Kiosk structure.  The Hospital will be responsible for all cleaning outside of the confines of the Kiosk, including, but not limited to, all spot mopping.

8

**Confidential and Proprietary**

(f) Morrison will have the right to select the menu items to be sold at the Kiosk and the right to set the prices for those items. Morrison agrees to review its initial Kiosk pricing structure with the Hospital. Morrison will have the right to increase Kiosk prices from time to time. However, Morrison agrees to provide the Hospital with at least ten (10) days notice prior to increasing prices of items sold at the Kiosk. Morrison will also provide the Hospital with an explanation of the reason for the price increase.

(g) Morrison will retain all sales generated by the Kiosk operation. Morrison will be responsible for collecting and remitting all applicable sales and use taxes related to sales generated by the Kiosk operation.

(h) Morrison has agreed that the Hospital shall receive a minimum of $30,000 in commissions for each applicable twelve (12) month annual operating period which initial operating period will start after completion of the Kiosk Improvements). At the end of each annual twelve (12) month operating period, the parties will calculate the actual amount of the commissions that Morrison has paid to the Hospital pursuant to paragraph 2.9(c). If the sum of the monthly commissions paid by the Hospital pursuant to paragraph 2.9(c) during the applicable annual operating period are less than $30,000, then Morrison will pay the remaining amount owed for that operating period within thirty (30) days of the date the commission reconciliation has been completed (or, in the alternative, Morrison may provide a credit on its invoice for the additional amount owed).

(i) Morrison agrees to make available the sum of up to $120,000 for investment ("Kiosk Investment") in renovations, capital equipment and improvements (the "Kiosk Improvements") in connection with the implementation of the Kiosk. The Kiosk Improvements shall be made and located as mutually agreed upon. All such Kiosk Improvements may be removed or replaced with the parties' approval, and the Kiosk Investment shall be amortized/depreciated monthly by straightline method from the date(s) such Kiosk Investment funds are used to no later than December 31, 2016 (or a shorter period of time if required by generally accepted accounting principles). The monthly amount of the amortization/depreciation will be based on Morrison's then current accounting period used by Morrison's parent company (Compass Group USA, Inc.). Morrison has agreed to bear the cost of the Kiosk Investment. The Hospital agrees to pay Morrison immediately the full unamortized/undepreciated value of the Kiosk Investment plus interest at the "Prime" rate plus 1%, compounded, on the unamortized/undepreciated amount of the Kiosk Investment calculated from the date of such Kiosk Investment or purchase of the equipment if one or more of the following occur prior to full amortization/depreciation of the Kiosk Improvements then on-site: (a) this Agreement is terminated for any reason or (b) Morrison's services at the Kiosk are terminated for any reason. Morrison shall initially retain title to the Kiosk Improvements. Title to the Kiosk Improvements shall pass to Hospital after full amortization/depreciation of the Kiosk Investment, or, if this Agreement is terminated prior to full amortization/depreciation, after payment to Morrison of all amounts owed under this paragraph. The "Prime" rate for such calculations will be determined at the date of such Kiosk Investment or purchase of the equipment and will be as published by the Wall Street Journal. The Hospital, not Morrison, will be responsible for costs incurred in connection with the Kiosk Investment or Kiosk Improvements due to delays or costs that are incurred due to circumstances beyond Morrison's control, including, but not limited to, force majeure events; delays in the permitting process; or the existence of hidden, latent and/or unknown problems such as the discovery of asbestos or other hazardous materials.

(j) Morrison will provide an amortization/depreciation schedule for the Investment and Additional Investment to the Hospital after the Investment and Additional Investment funds have been used and all of the Improvements and Additional Improvements made. The amortization/depreciation schedule will identify the approximate amount of the amortization/depreciation on Morrison's books on a monthly basis during the term of this Agreement.

## ARTICLE 3 - TERM AND TERMINATION

9

**Confidential and Proprietary**

3.1 **Term.** The initial term of this Agreement will extend from the Effective Date for a period of seven (7) years and may be renewed for an additional seven (7) year term if mutually agreed upon by the parties in writing. This Agreement may be terminated:

(a) at any time by mutual written agreement;

(b) by either party without cause provided that (1) the second anniversary of the Effective Date has passed and (2) the party seeking such termination provides at least ninety (90) days prior written notice to the other party;

(c) by Morrison upon seven (7) days prior written notice if the Hospital fails to pay any amounts due within thirty (30) days from the date of Morrison's billing that is not cured within seven (7) days from written notice; and

(d) by either party for cause for the other party's failure to perform any duty or obligation under this Agreement in accordance with paragraph 3.3.

3.2 **Changes in Ownership/Administration.** Notwithstanding §3.1, because significant effort and expense has been made by each party in developing this relationship and opportunity, the parties agree that termination of this Agreement will not be initiated by Hospital within four (4) months of a significant change in Hospital's ownership or administration, unless such termination is based upon a material breach of this Agreement by Morrison which is not cured within thirty (30) days of written notice to Morrison. "Administration" for the purpose of this Agreement shall mean and refer to the Hospital's Chief Executive Officer, Chief Operating Officer, or the person to whom Morrison reports to with respect to Morrison's operation of the Department.

3.3 **Termination for Cause:** If Morrison is not performing Services in accordance with the requirements of this Agreement, or if Hospital is not performing its obligations under this Agreement (other than its obligation to pay, which is governed by paragraph 3.1(c)), and Hospital or Morrison (as applicable) desires to terminate this Agreement for cause, the party seeking such termination must give the other party sixty (60) days written notice of its intention to cancel this Agreement if such service or other deficiencies are not corrected within that time (the "Cure Period"), which notice shall specify the service area defaults in detail. At the end of the sixty (60) days Cure Period, the party seeking such termination shall determine that either (i) the service or other deficiencies have been corrected, in which case the contract will continue in full force and effect subsequent to the Cure Period, or (ii) the service or other deficiencies have not been corrected, in which event the party seeking termination may, by further written notice, cancel this Agreement sixty (60) days from the end of the Cure Period. In the event that the party seeking such termination does not act pursuant to either (i) or (ii) above, the service or other deficiency shall be deemed corrected and the Agreement shall continue in full force and effect thereafter.

## ARTICLE 4 - COMPLIANCE WITH LAWS

4.1 **Compliance.** Morrison and the Hospital agree to comply with all Applicable Laws, including New York State and local health department rules, regulations and requirements.

4.2 **The Joint Commission** Morrison agrees to comply with all regulations established by The Joint Commission to which the Hospital may be subject, to the extent Morrison is required to comply. With regard to any fees, discounts, commissions, charges, donations or investments that are provided to the Hospital, the Hospital is solely responsible for any cost reporting or other compliance with state or federal agencies under Medicare/Medicaid programs, as well as any other governmental requirements, charges, liabilities or levies, and any cost reporting for amounts to the Hospital or Morrison under Section 1.3(c).

10

**Confidential and Proprietary**

4.3 **Taxes.** Unless otherwise exempt, the Hospital will be responsible and pay for all taxes, fees, assessments and licenses, including without limitation, any sales and use taxes, liquor licenses, personal property taxes on equipment or investments provided by Morrison, taxes on operation of the Facility, any taxes imposed on Morrison's fees or other charges to the Hospital pursuant to this Agreement, and any of the above that result from new taxes, legislation or enforcement positions. Taxes resulting from any new taxes, legislations or enforcement positions will be excluded from the Department's actual net cost for the purpose of the Financial Incentive Plan set forth in Exhibit D.

4.4 **Exemptions.** The Hospital will be responsible for providing Morrison any applicable exemption or resale certificate(s) related to Morrison's Services for the Hospital.

4.5 **Non-discrimination.** Neither party will discriminate in any unlawful manner. Any changes necessary to the physical facility to comply with the Americans with Disabilities Act will be the Hospital's responsibility.

## ARTICLE 5 - EMPLOYMENT RESTRICTION

5.1 **Protection for Hospital Employees.** During this Agreement and for one year after its termination (the "Period of Restriction"), Morrison will not, either directly or indirectly, on its own behalf or for others, divert, solicit or hire away, without the Hospital's prior written approval, any management, clinical or professional employee working in the Hospital's Department and on the Hospital's payroll at any time during the term of this Agreement (the "Protected Hospital Employees"). Provided, however, the term Protected Hospital Employees shall not include: (a) Management Personnel employed by Morrison, (b) employees provided by Morrison for assignment to the Department, and (c) employees hired by Morrison pursuant to Article 1 of this Agreement. If Morrison violates this Section 5.1, then Morrison agrees to pay an amount equal to one (1) years' salary of such personnel, as liquidated damages and not as a penalty. Acceptance of such payment does not constitute a waiver of any other remedies or rights the Hospital may have either at law or in equity, including temporary restraining orders or injunctive relief.

5.2 **Protection for Morrison Employees.** During the Period of Restriction, the Hospital will not, either directly or indirectly, on its own behalf or for others, divert, solicit or hire away, without Morrison's prior written approval, any then current or former Morrison management, clinical or professional personnel who have provided services at the Facility (including, but not limited to, Morrison's Management Personnel and the Morrison regional personnel who provide support services at the Facility), or allow such personnel to perform services directly or indirectly for the Hospital or on or from its Facility or property (whether employment is directly by the Hospital on its payroll, directly by the Hospital by hiring the personnel as an independent contractor, indirectly through a subsequent third party food service contractor, or otherwise). If the Hospital violates this Section 5.2, then the Hospital agrees to pay an amount equal to one (1) years' salary of such personnel, as liquidated damages and not as a penalty. Acceptance of such payment does not constitute a waiver of any other remedies or rights Morrison may have either at law or in equity, including temporary restraining orders or injunctive relief.

5.3 **Exception to Employment Restriction.** (a) The restrictions set forth in paragraph 5.2 will not apply to any Morrison management, clinical or professional personnel who was employed by the Hospital or the Hospital's previous food service contractor Aramark immediately prior to being hired by Morrison.

(b) The restrictions set forth in paragraphs 5.1 and 5.2 shall not apply to any employee of a party (the "First Party") who is hired by the other party more than two years after the employee has ceased working for the First Party.

## ARTICLE 6 - INSURANCE AND INDEMNITY

11

**Confidential and Proprietary**

6.1 **Liability Insurance.** Morrison agrees to obtain public liability and products liability insurance in the amount of $1,000,000 combined single limits, or maintain a program of self-insurance, in connection with the goods and Services furnished by Morrison under this Agreement, with excess coverage in an amount not less than Five Million Dollars ($5,000,000) to cover claims in the aggregate. Morrison shall cause the Hospital to be added as an additional insured to Morrison's general liability insurance policy to the extent that a third party asserts a claim or demand against the Hospital arising out of Morrison's negligent acts or omissions. Morrison shall provide a Certificate of Insurance for the above coverage within thirty (30) days of the Effective Date. Morrison will arrange for Hospital to receive at least ten (10) days written notice of any cancellation, expiration or reduction in the amount of Morrison's liability insurance coverage. Morrison shall invoice the Hospital for such insurance coverage based upon Morrison's company-wide rate applied to managed volume. Hospital shall obtain and maintain All Risk insurance, with replacement cost coverage, for the Hospital's Facility and other Property against risks covered by standard forms of fire, theft, and extended coverage and shall maintain general liability insurance in such amounts under such policies as appropriate, but not less than One Million Dollars ($1,000,000.00) per occurrence, with excess coverage in an amount not less than Five Million Dollars ($5,000,000.00) to cover claims in the aggregate.

6.2 **Worker's Compensation.** Both parties will furnish and maintain workers' compensation insurance as prescribed by law and employer's liability insurance in the amount of $100,000 for all of their respective employees, or either party may provide such coverage through a self-insurance program in accordance with Applicable Law. If requested, each party agrees to furnish the other with a certificate of such insurance (unless self-insured). Each party further agrees to bear its own cost and to hold the other party harmless from any claims by its own employees covered by such workers' compensation insurance/self-insurance. If a workers' compensation injury results in lost time or medical expenses for a Morrison employee, then Morrison's standard unit claim charge will be applied as a cost of operation. This standard unit claim charge may be adjusted annually, and is currently $750 per claim.

6.3 **Indemnity.** (a) Subject to Sections 6.2 and 6.4, Morrison shall indemnify, defend and hold harmless the Hospital and its officers, agents and employees, with respect to any and all liability, losses, claims, suits, damages, taxes, charges and demands of any kind and nature by any party which any of them may incur or suffer to the extent resulting from any negligent act or omission of Morrison. Morrison shall not be required to indemnify, defend or hold harmless the Hospital for any liability, losses, claims, suits, damages, taxes, charges and demands to the extent resulting from the Hospital's acts or omissions or the acts or omissions of a third party.

(b) Subject to Sections 6.2 and 6.4, the Hospital shall indemnify, defend and hold harmless Morrison and its officers, agents and employees, with respect to any and all liability, losses, claims, suits, damages, taxes, charges and demands of any kind and nature by any party which any of them may incur or suffer to the extent resulting from any negligent act or omission of Hospital. Hospital shall not be required to indemnify, defend or hold harmless Morrison for any liability, losses, claims, suits, damages, taxes, charges and demands to the extent resulting from Morrison's acts or omissions of the acts or omissions of a third party.

6.4 **Release.** Morrison and the Hospital release each other from any responsibility for damage to the Facility or other property owned by either party, caused by fire or other casualty and resulting directly or indirectly from the use or occupancy of the Facility or any portion thereof by Morrison. Each party agrees to notify its respective insurance carrier(s) of this release.

## ARTICLE 7 - FORCE MAJEURE

12

**Confidential and Proprietary**

7.1 **Force Majeure Events.** Neither Morrison nor the Hospital shall have any liability for failing to perform this Agreement when performance is prevented by force majeure. The term "force majeure" shall mean any government requirement or request, war, public disorders, acts of enemies, sabotage, strikes, lockouts, picketing, labor or employment difficulties, fires, floods, acts of God, natural disasters, accidents or breakdowns (whether or not preventable), or any other cause beyond the reasonable control of either party.

7.2 **Services Under Force Majeure.** The Hospital and Morrison understand and agree that events such as hurricanes, tornadoes, fires, floods, concerted employee, union or related activity, or similar severe weather, natural disasters, or labor unrest may interfere with the efficient performance and contemplated operations under this Agreement, and will result in direct and indirect costs not reflected in the above rates and charges. The parties agree that under such conditions, Morrison will work together with the Hospital in good faith to provide services and develop appropriate responses and courses of action, as is practical and reasonable under the circumstances. If Hospital requests that Morrison provide the Services during a force majeure event, any financial or performance guarantees or incentive penalties (see e.g, paragraphs 2.7,  and 2.8) to Morrison will not apply under these conditions and instead the Hospital will be responsible for, and hold Morrison harmless from, all costs and expenses associated with the services, responses, courses of action, and operations, whether directly or by reimbursement to Morrison, along with the fees and charges referenced above.

## ARTICLE 8 - PROPRIETARY INFORMATION

8.1 **Existence.** During the term of this Agreement, each party acknowledges that it may acquire, be exposed or obtain access to Proprietary Information of the other party.

8.2 **Protection.** All Proprietary Information is confidential to the disclosing party and at all times will be the disclosing party's sole and exclusive property. In the event a party receives, obtains access or otherwise is exposed to any Proprietary Information of the other party, the receiving party will, and shall cause its officers, employees and agents to:
    (1) hold the disclosing party's Proprietary Information in trust and in strictest confidence;
    (2) not produce, use, copy, distribute or otherwise disseminate the disclosing party's Proprietary Information except to the extent necessary to aid in performance of the Services; and
    (3) otherwise protect the disclosing party's Proprietary Information from disclosure.

8.3 **Disclosure.** Disclosure of the disclosing party's Proprietary Information by the receiving party will not be made to anyone except as necessary for performance of the Services on a specific need to know basis to those who have agreed to hold the disclosing party's Proprietary Information in trust and strictest confidence in accordance with the terms of this Agreement. The receiving party will take reasonable precautions to prevent disclosure of the disclosing party's Proprietary Information to anyone without a need to know such information.

8.4 **Return.** Upon request by the disclosing party, and in any event upon termination of this Agreement, the receiving party shall return all property belonging to the disclosing party that is in the receiving party's custody, control or possession, including all materials containing the disclosing party's Proprietary Information.

8.5 **HIPAA.** Morrison agrees to maintain the confidentiality of any health care information in accordance with all applicable laws and regulations including, but not limited to, the requirements of the Federal Health Insurance Portability and Accountability Act of 1996 and its related regulations ("HIPAA"). Morrison further agrees to all of the terms and conditions set forth in the Business Associate Agreement which is attached hereto and made a part hereof as Exhibit F, and shall execute any additional documents or amendments to this Agreement which are reasonably necessary to comply with HIPAA.

C:\USERS\PHILLM01\DOCUMENTS\2009 WORK FOLDER\STATEN ISLAND UNIVERSITY HOSPITAL FEE WITH INCENTIVE CONTRACT 12.30.09 V.2 CLEAN.DOC

**Confidential and Proprietary**

## ARTICLE 9 - MISCELLANEOUS

9.1 **Notices.** All notices under this Agreement will be:

(a) in writing;

(b) sent prepaid via overnight courier/certified/registered mail or overnight mail by a reputable carrier, hand delivery or confirmed facsimile (with follow up by another approved notice method); and

(c) sent to the following address' or such other address as may be designated in writing::

> TO    Hospital:    Staten Island University Hospital
> Department of Legal and Regulatory Affairs
> Attention:  General Counsel
> 475 Seaview Avenue
> Staten Island, New York 10305
>
> TO    Morrison:    Attention: Legal Department
> Morrison Management Specialists, Inc.
> 5801 Peachtree Dunwoody Road
> Atlanta, GA 30342

The Hospital shall also deliver any notice to Morrison at the Facility.   Notices are deemed received upon actual receipt.

9.2 **Entire Agreement and Severability.** This Agreement constitutes the entire agreement of the parties with respect to the subject matter.  Neither party has relied on any representation, promise, agreement, condition or understanding which is not expressly set forth herein.  The terms of this Agreement may not be amended or modified except by a further written statement signed by the parties specifically referencing this Agreement.  In case any part of this Agreement is held invalid, illegal or unenforceable, it shall not affect any other provision.

9.3 **Successors/Assignment.** This Agreement will inure to the benefit of, be binding on, and be enforceable by, the Hospital and Morrison and their lawful successors, representatives and assigns.  Either party may assign this Agreement to a parent company, affiliate or subsidiary without notice to the other party.  No other assignment shall be valid unless the assignor obtains the prior written consent of the other party.

9.4 **Enforcement.** If Morrison deems it necessary to enforce this Agreement, the Hospital shall pay to Morrison upon demand all costs and expenses incurred by Morrison in connection with such enforcement, including attorney's fees.  No failure or delay on the part of either party in exercising any right or remedy under this Agreement shall operate as a waiver.  No provision of this Agreement may be waived except specifically and in writing.

9.5 **Applicable Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York.

9.6 **Survival.** Upon termination, all rights and obligations under this Agreement will end (except for accrued, unpaid compensation, and the provisions of Articles 5, 6, 8 and 9, all of which will survive such termination).

9.7 **Waiver of Consequential Damages.** Morrison and the Hospital waive claims against each other for consequential damages arising out of or relating to any Services Morrison is providing hereunder.

14

**Confidential and Proprietary**

This mutual waiver includes (a) damage incurred by Hospital for rental expenses, for loss of use, income, profit, financing, business and reputation, and for loss of productivity or of Services of persons or property; and (b) damages incurred by Morrison for expenses associated with personnel providing Services and for loss of profit associated with Services performed for Hospital. This mutual waiver shall not apply to any applicable amounts due or charges or credits required by the terms of this Agreement.

9.8 **Information Technology Systems.** In connection with the services being provided hereunder, Morrison may need to operate certain information technology systems not owned by the Hospital (**Non-Hospital Systems**), which may need to interface with or connect to Hospital's networks, internet access, or information technology systems (**Hospital Systems**). Morrison shall be responsible for all Non-Hospital Systems, and Hospital shall be solely responsible for Hospital Systems, including taking the necessary security and privacy protections as are reasonable under the circumstances. If Morrison serves as the merchant-of-record for any credit or debit card transactions in connection with any of the services provided hereunder, then Morrison will be responsible for complying with all applicable laws, regulations and payment card industry data security standards related to the protection of cardholder data (**Data Protection Rules**). If Non-Hospital Systems interface with or connect to Hospital Systems, then Hospital agrees to implement forthwith upon request from Morrison, at its own expense, the changes to the Hospital Systems that Morrison reasonably requests and believes are necessary or prudent to ensure Morrison' compliance with the Data Protection Rules. Each party shall indemnify, defend and hold harmless the other party from all claims, liabilities, damages and costs (including reasonable attorneys' fees) to the extent caused by the indemnifying party's failure to comply with its obligations in this Section.

9.9. **Eligibility for Government Programs**. Morrison represents that it has not been convicted of a criminal offense related to health care, and it is not currently listed by a federal agency as debarred, excluded or otherwise ineligible for participation in federal programs and/or federally funded health care programs. Morrison further represents that it has truthfully completed the Vendor Certification provided by Staten Island University Hospital ("SIUH"). Morrison shall notify SIUH immediately, in writing, of any change in circumstances related to its representations made herein or the representations it made in the SIUH Vendor Certification during the term of this Agreement. It is further understood and agreed that Morrison's failure to complete the SIUH Vendor Certification, or Morrison's misrepresentation herein or misrepresentation made in the SIUH Vendor Certification, or any change in circumstances related to Morrison's representations shall, notwithstanding Article 3, allow the Hospital to terminate this Agreement (which termination may be with or without cause depending on the circumstances). For purposes of this paragraph, Morrison is defined as the entity entering into this contract, and/or its principals, physicians, directors, officers and shareholders.

9.10 **Personal Inducements.** Morrison represents and warrants that no cash, equity interest, merchandise, equipment, services or other forms of remuneration have been offered, shall be offered, or will be paid or distributed, by or on behalf of Morrison to Hospital and/or the physicians, officers, or directors of Hospital, or to any other person, party or entity affiliated with Hospital; as an inducement to purchase or to influence the purchase of services by Hospital from Morrison. The parties agree that equipment or other items provided by Morrison pursuant to the Morrison investments referenced in Article 2 of this Agreement shall not be a violation of this paragraph.

9.11 **Conflicts of Interest**. Morrison represents that it has disclosed to Hospital all relationships or financial interests that may represent or could be construed as a conflict of interest with respect to Morrison's transaction of business with Hospital. Except as may be disclosed in writing by Morrison, Morrison further represents that no employee, director or officer of Hospital is a partner, member or shareholder of, or has a financial interest in Morrison. For purposes of this Section, the term "financial interest" shall include, but not be limited to, the following transactions or relationships between an employee, director or officer of Hospital and Morrison - consulting fees, honoraria, gifts or other

15

**Confidential and Proprietary**

emoluments, or "in kind" compensation; equity interests, including stock options, of any amount in a publicly or non-publicly-traded company (or entitlement to the same); royalty income (or other income) or the right to receive future royalties (or other income); any non-royalty payments or entitlements to payments; or service as an officer, director, or in any other role, whether or not remuneration is received for such service. A breach of any representation under this Section shall be grounds for immediate termination of this Agreement.

## ARTICLE 10 - DEFINITIONS

10.1 "**Applicable Law**": statutes, regulations, ordinances and other legal requirements, to the extent applicable to Morrison and the Hospital.

10.2 "**At Cost**" or "**Cost**": the charge by Morrison to Hospital for items or services that will include all applicable supply, labor (with Percentage Rate), insurance, equipment and other related operational costs required for the item or service, but will not include any separate, additional fee by Morrison that is not otherwise provided for in this Agreement. "At Cost" or "Cost" for items that are purchased by Morrison will be based on the invoice price paid by Morrison.

10.3 "**CPI Adjustment**": the adjustment to rates and charges based on the 12 Months Percent Change increase over the prior year in the Consumer Price Index – All Urban Consumers, Hospital and Related Services, Not Seasonally Adjusted, Series ID: CUUR0000SEMD as published by the United States Department of Labor, Bureau of Labor Statistics.

10.4 "**Facility**": the areas, improvements, real and personal property and facilities of the Hospital, and in particular those related to or used in providing the Services at the North Site and the South Site.

10.5 "**Management Percentage Rate**": A percentage rate of payroll charge which relates to direct and indirect payroll taxes, workers' compensation insurance, employer's portion of state and federal unemployment compensation tax, social security tax, accident and health insurance, life insurance and retirement plan contributions, fringe benefits and related overhead. Morrison's applicable Management Percentage Rate shall be subject to an annual increase each year that this Agreement is in effect (generally on October 1 of each year commencing on October 1, 2010). The amount of the increase will be based on the percentage increase in the Management Percentage Rate as established by Morrison's parent company, Compass Group USA, Inc. In addition to the above, Morrison's applicable Management Percentage Rate shall also be adjusted (either increased or decreased) to reflect changes in Applicable Law that affect Morrison's applicable Management Percentage Rate such as changes in payroll tax rates, insurance rates (e.g. federal or state unemployment insurance) or required benefits; such increases shall be changed effective from the date of change in such rates or benefits. Additional Management Percentage Rate costs resulting from a change in Applicable Law will be excluded from the Department's actual costs for the purpose of the Financial Incentive Plan set forth in Exhibit D.

10.6 "**Proprietary Information**": all trade secrets and/or confidential or proprietary information related to the business of Morrison, the Hospital or their respective affiliates, in any physical, electronic, computerized or other form, including but not limited to: technical and nontechnical data related to operations; computer programs; software; diet manuals; videotapes; methods; techniques; processes; finances; actual or potential customers and suppliers; existing and future products; recipes; production sheets; policy, procedure and/or personnel manuals; employees of Morrison, the Hospital and their respective affiliates; and any information which has been disclosed to Morrison or the Hospital by a third party which Morrison or the Hospital is obligated to treat as confidential.

16

**Confidential and Proprietary**

10.7  **"Services"**:  the supervision of the food services at the Facility and catered events, as exclusively provided to Hospital by Morrison under this Agreement (subject to paragraph 1.1(b).

10.8 **"Smallwares"**:  non-powered kitchen related items used to prepare and serve food, such as pots, pans, scoops, chef knives, cutting boards, bowls, cooking and kitchen utensils and similar loose items, etc.

10.9  **"Tablewares"**:  items used by individuals in consuming food, such as china, dishware, silverware, flatware, table utensils, glassware, etc.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives, effective as of the Effective Date.


WITNESS:                                          STATEN ISLAND UNIVERSITY HOSPITAL

_____       By _____
                                                            Donna Proske

                                                       As its   Executive Vice President and Chief Operating Officer

                                                       Date   12/31/09

WITNESS:                                          MORRISON MANAGEMENT SPECIALISTS, INC.

_____       By _____
                                                            Scott Neil MacLellan

                                                       As its          CEO

                                                       Date   1/4/10

17

**Confidential and Proprietary**

**Exhibit A**

**Quality Assurance**

Morrison will utilize a customized quality assurance program at Staten Island University Hospital—North and South. The Food Services Department will implement a performance improvement program, which encompasses major aspects of its functions. This program will provide methodology with the goal of continuously improving the work and outcome results of the department.

Major focus area may include:

- Tray Accuracy
- Test Tray Evaluation
- Sanitation
- Safety
- Meal Service
- Nutrition Services Records
- Patient Satisfaction
- Clinical Protocols to be determined by each site

The results of the monitors will be tabulated and recorded on the Performance Improvement Indicator form by assigned manager or designee. All areas identified on the monitor that are not within compliance must include an action plan for correction. The parties shall mutually agree on how improvement will be achieved. Results of the monitors are to be discussed monthly at a manager's meeting, so that corrective action remains a team effort. Results also need to be discussed with all appropriate department staff members. It is important to look for trends in the results of the monitors, especially if improvement is not noted. It may be necessary to identify one specific problem area of a monitor to evaluate in more detail. All performance monitors will be kept in a specific binder. A yearly calendar will be developed, defining who is responsible for completing each weekly, monthly or annual review.

18

**Confidential and Proprietary**

**EXHIBIT B**

**Morrison Programs**

The following program components as outlined in the Morrison proposal will be customized and implemented during the first year of transition (subject to the approval of the Hospital).

*System-wide*
- Patient 21 Standards
- Love Em or Lose Em—Associate Engagement Approach
- Associate Training—inclusive of Daily Meetings and Customer Service Training
- Associate Recognition Programs
- Culinary Support and Training—Passion for Life's Flavors
- Daily Patient Rounding
- Morrison Menus specific to each facility/retail and patient
- Great Living Starts Here Patient Education Materials
- Clinical Dietitian Support and Resources
- Profiles Retail Upgrades (signage, refresh)
- Canteen Vending (machine refresh)
- Weight Watchers (If mutually agreed upon by the parties as being appropriate)
- Balanced Choices

- eFinance Web-based financial tools
- Webtrition
- TrimTrax
- Horizon Point of Sale System
- Acute Care Policy and Procedure Manual
- Vending Programs

*South Campus*
- Customized contemporary patient meal service for Behavioral Health population. (dependant on budget approval if needed)

*North Campus*
- Outtakes® (Atrium lobby)
- Catering to You® Patient Room Service

19

**Confidential and Proprietary**

**Exhibit C**

**Sample Bill**



| Services | From: 1/1/2010    To: 1/7/2010 | | Attention: | Donna Proske | |
|---|---|---|---|---|---|
| Remit To: | Morrison Management Specialists | | Bill To: | Staten Island University Hospital | |
| Address | P.O. Box 102289 | | Address | 475 Seaview Avenue | |
| City / State | Atlanta | GA    30368-2289 | City / State | Staten Island    NY    10305 | |

| Item Name | Contract Ref. | Details | Amount |
|---|---|---|---|
| Food Cost | Para. 2.1 (a) | | 64,358.00 |
| Management Labor | Para. 2.1 (a) | | 25,019.00 |
| Labor Admin Costs | Para. 2.1 (a) | | 10,649.00 |
| Direct Expenses | Para. 2.1 (a) | | 16,717.00 |
| Management Fee | Para. 2.2 (a) | | 1,308.00 |
| Admin Fee | Para. 2.2 (a) | | 3,292.00 |
| Prior Month Adjustment | | Prior Month Adjustment | 0.00 |
| | | Sub Total: | 121,343.00 |
| | | Tax: | .00 |
| | | Total Due: | 121,343.00 |

**Authorized by:** _____    **Received on:** _____

*Payment is due within  30  days of the date of receipt of Morrison's billing. Any payment received past the due date shall bear a finance penalty of    1    % per month.*

20

**Confidential and Proprietary**

**Exhibit D**

**Financial Incentive Plan**

    I.    The Guaranteed Net Cost Budget.  (a) Morrison shall be allowed to charge Hospital incentive fees or be required to provide incentive credits to the Hospital for results which exceed or fall below the agreed upon performance criteria as set forth below.  This Financial Incentive Plan will become effective on January 1, 2010 (the "Commencement Date").

    (b)  The financial data set forth in this Exhibit D are based on the Guaranteed Net Cost Budget for the 2010 calendar year that is attached to this Agreement as Exhibit E.  The Guaranteed Net Cost Budget, if any, for each subsequent calendar year will be mutually agreed upon by the parties in writing one hundred twenty (120) days prior to start of the next calendar year.  The budget for subsequent calendar years will include adjustments for, among other things, increases in the cost of food, supplies and labor; increases or decreases in costs or revenues arising out of changes in scopes of services; or any other increases or decreases in costs or revenues due to other changes in the operation of the Hospital's Department such as increases or decreases in revenues or increases or decreases in staffing.

    (c)  The Department's actual net cost will be compared to the Guaranteed Net Cost Budget on a monthly basis so that the parties can monitor the Department's performance versus the Guaranteed Net Cost Budget.  Applicable charges and credits under this Financial Incentive Plan for each calendar year will be charged/credited on an annual basis after the parties have reconciled the financial data after the conclusion of the applicable calendar year.

    (e) If this Agreement is terminated, then this Financial Incentive Plan will not apply for the year in which the termination became effective (or thereafter) unless otherwise agreed in writing by the parties. Any charges or credits applicable under this Financial Incentive Plan will be invoiced by Morrison to Hospital on Morrison's next billing after the financial reconciliation has been completed.

    II.  Items Included in the Guaranteed Net Cost Budget.  -  The Guaranteed Net Cost Budget includes only the following dining services expenses:

    (a)  the cost of Morrison's Management Personnel, including Morrison's applicable Management Percentage Rate which shall be initially established at 42.53% and which shall increase in accordance with paragraph 10.5;

    (b) the following direct expenses:  food; paper, chemicals and supplies, office supplies/stationery; menus, replacement-china/silverware/glassware, pest control at the South Campus, repairs/maintenance, Freedom Pay Service Fee at the North Campus, telephone service, postage, smallwares, monor equipment replacement (under $500), nourishment and floorstock paper, marketing, patient in service training materials and supplies; management travel and education, clinical dietitian travel and education, dues and subscriptions, licenses and permits (other than alcohol), miscellaneous kitchen and catering, Horizon POS system, Data Quest, Steritech audit, computer hardware/printer paper provided by Morrison; computer software provided by Morrison; and computer related charges (for computers provided by Morrison).

    (c)  Revenues generated by the retail areas operated by Morrison (net of sales and use taxes), including, but not limited, to, the Hospital cafeteria such as cash and credit card sales (e.g., retail sales at a cafeteria), doctor's charges sales, and Freedom Pay sales;

C:\USERS\PHILLM01\DOCUMENTS\2009 WORK FOLDER\STATEN ISLAND UNIVERSITY HOSPITAL FEE WITH INCENTIVE CONTRACT 12.30.09 V.2 CLEAN.DOC

**Confidential and Proprietary**

(d)  The "capped" items identified in paragraph III below; and

(e)  Morrison's management fee and general and administrative charge and Morrison's general liability insurance charge.

All costs related to other items or services are excluded from the Guaranteed Net Cost Budget for the purpose of this Financial Incentive Plan unless such items or services are specifically identified in this Exhibit D as being included in the Guaranteed Net Cost Budget. Items and services excluded from the budget include, but are not limited to: costs related to vending services; costs related to the operation of the Outtakes® Kiosk; wages and associated payroll costs such as payroll taxes, insurance and fringe benefits for the Hourly Personnel; telephone service (local and long distance); internet access; copying; business licenses and permits; utilities; pest control for the North Site (South Site pest control is capped in accordance with paragraph III); employee physicals, background checks and testing for Hospital employees (physicals, testing and background checks for Morrison employees are included in the budget); doctor's dining, garbage/trash removal; service contracts; equipment replacement; armored car service; bank card charges and credit card fees.

    III.    <u>Capped Items</u>. (a) The Guaranteed Net Cost Budget assumes that the Department costs identified in paragraph III(b) will not exceed the amount of the applicable annual food and supply cost caps. If the Department's aggregate food and supply costs exceed an annual aggregate cap, then an adjustment will occur for the purpose of comparing the Department's actual net cost to the applicable Guaranteed Net Cost Budget.

    (b)  The following items are subject to an annual food and supply cost cap as set forth in the "Annual Cap Amount" column for each item. If the actual annual food and supply cost of an item exceeds the "Annual Cap Amount" for that item, then the parties will reduce the Department's actual net cost for the purpose of comparing the Department's actual net cost to the Guaranteed Net Cost Budget. The amount of the reduction will be equal to the difference between the actual annual food and supply cost for the item and the "Annual Cap Amount" for the item. For example, if the actual annual food and supply cost for nourishments was $164,098, then the amount of the reduction to the Department's actual costs for the purpose of reconciling actual costs to the Guaranteed Net Cost Budget would be $1,000 (the $1,000 difference between actual and projected costs).

| Item/Service | Annual Cap Amount |
|---|---|
| Nourishments | $ 163,098 |
| Floor Stocks | $ 382,722 |
| Commercial Supplements | $ 96,306 |
| Outpatient Meals | $ 52,227 (includes: observation, outpatient, emergency room and guest meals) |
| Department Requisitions | $ 169,199 |
| Regular Pantry Meals | $ 21,074 |
| Kosher Resident Meals | $ 32,760 |
| Kosher Pantry Meals | $ 16,744 |
| Equipment Repairs and Maintenance | $ 130,154 |
| Pest Control (South Site) | $ 1,638 |
| Freedom Pay Service Fees | $ 5,200 |
| Catering and Special Events | $ 266,337 |
| Free Meals | $ 173,869.88 |

    (c)  The actual annual cost for free meals will be calculated by multiplying the actual retail sales value of the free meals provided by Morrison times 48.96% (e.g., if the retail sales value of the free meals is $380,000, the the food and supply cost would be $186,048 ($380,000 times .4896)). The 48.96% represents 38.96% for the cost of food and 10% for the cost of related supplies for free meals provided

22

**Confidential and Proprietary**

by Morrison. If the actual annual food and supply cost for free meals is greater than or less than $173,869.88 then the parties will adjust the Department's actual net cost in accordance with Paragraphs III(b) and III(d) as applicable.

(d)    No budget adjustment will occur if the actual food and supply cost for floor stocks, nourishments or supplements are less than the amount set forth in the "Annual Cap Amount" column for those items. With respect to the other items in the table above, the parties will increase the Department's actual net cost for the purpose of comparing the Department's actual net cost to the Guaranteed Net Cost Budget if the food and supply cost for an item is less than the "Annual Cap Amount". The amount of the increase will be equal to the difference between the actual annual food and supply cost for the item and the "Annual Cap Amount" for the item. For example, if the actual annual food and supply cost for kosher pantry meals was $17,244, then the amount of the increase in the Department's actual costs for the purpose of reconciling actual costs to the Guaranteed Net Cost Budget would be $500 (the $500 difference between actual and projected costs).

IV. At a mutually agreed upon time at the end of each calendar year, and subject to all applicable adjustments set forth in this Financial Incentive Plan, the parties will determine what incentive credits or charges apply by comparing the Department's actual net cost for the applicable calendar year to the Guaranteed Net Cost Budget for that calendar year. The parties shall exclude from the comparison any actual expenses incurred by the Department that are not identified in, accounted for or factored into the Guaranteed Net Cost Budget. The amount of the additional charges or credits to the Hospital are set forth in the table below:

| Result | Amount of Charge or Credit |
|---|---|
| Actual Net Cost Exceeds Budgeted Net Cost | Morrison credits the Hospital an amount equal to the difference between the actual net cost and the budgeted net cost. |
| Actual Net Cost is lower than Budgeted Net Cost by $132,000 or less (during the first contract year only)* | Morrison charges the Hospital an amount equal to the difference between the actual net cost and the budgeted net cost. |
| Actual Net Cost is lower than Budgeted Net Cost by more than $132,000 (during the first contract year only)* | Morrison charges the Hospital an amount equal to $132,000 plus 50% of the budget savings in excess of $132,000** |
| Actual Net Cost is lower than Budgeted Net Cost (during the second contract year and each subsequent contract year) | Morrison charges the Hospital an amount equal to fifty percent (50%) of the difference between actual net cost and the budgeted net cost |

*During the first contract year, Morrison is entitled to charge the Hospital for the first $132,000 of any savings plus fifty percent (50%) of any savings in excess of $132,000. During each subsequent contract year, Morrison is entitled to charge the Client for fifty percent (50%) of all savings.

**If the actual net cost was lower than the budgeted net cost (after all applicable adjustments) by $200,000, then Morrison would be entitled to charge the Hospital $166,000 (which equals $132,000 plus 50% of the additional $68,000 in savings generated by Morrison).

V.    Financial Assumptions, Adjustments.    Morrison's Guaranteed Net Cost Budget is based on the following assumptions:

(a)    The Guaranteed Net Cost Budget is based on 210,368 projected annual patient days. If the actual patient days during a calendar year are greater than or less than 210,368, then a Variable Rate Adjustment will be made for the purpose of comparing the Department's actual net costs to the Guaranteed Net Cost Budget. More specifically, the Department's actual net costs will be reduced for the purpose of

23

**Confidential and Proprietary**

comparison if patient days are higher than 210,368 and the Department's actual net costs will be increased for the purpose of the comparison if patient days are lower than 210,368. The variable rate for Morrison's Services is $6.14 per patient day. The amount of the applicable adjustment (increase or decrease, as applicable) will be calculated by multiplying Morrison's applicable Variable Rate times the difference between 210,368 annual patient days and the actual number of patient days during the applicable calendar year. Morrison's Variable Rate will be subject to change on January 1, 2011 and each subsequent January 1 that this Agreement is in effect as mutually agreed upon by the parties.

(b)    If Hospital's patient days during a consecutive three (3) month period are greater than 57,851 or less than 47,333, then the parties will mutually agree to adjust the Guaranteed Net Cost Budget to account for the material increase/decrease in patient days.

(c)    Morrison's Guaranteed Net Cost Budget includes anticipated revenues from retail and other revenue producing operations, such as Morrison's estimated amount of annual revenue (net of tax) received per FTE at the Hospital's facilities, less the food and supply cost related to that revenue (the "Revenue per FTE"). Morrison's Guaranteed Net Cost Budget is based on the assumption that the Hospital will employ 4,900 FTEs. If average number of FTEs employed by the Hospital over any three (3) month period at the Facility is greater than 5,408 or less than 4,655, then the parties will mutually agree to adjust the Guaranteed Net Cost Budget to account for the material increase/decrease in FTEs at the Hospital's facilities.

VI.    If the nature or scope of this Agreement changes substantially, then the Guaranteed Net Cost Budget and/or the applicable fees or credits set forth herein shall be renegotiated by the parties. The parties shall also exclude from the comparison between the Department's actual net cost and the Guaranteed Net Cost Budget any Department expenses which result from an unforeseen or unanticipated change in the data and financial assumptions used to calculate the Guaranteed Net Cost Budget. By way of example, and not limitation, Morrison's Guaranteed Net Cost Budget assumes that the food cost/price ratio in the Hospital's cafeteria will not exceed 38.47% and that the employee discount will not exceed 20.00%. Morrison agrees that it will maintain the same price structure in the cafeteria during the first three (3) months of this Agreement. After that three (3) month period has elapsed, Morrison will have the right to adjust prices to meet the food cost/price ratio referenced above. The parties agree that they will meet on a quarterly basis to review the Department's actual food cost price ratio and that they will discuss the food cost/price ratio as part of the budget review process. Morrison will provide documentation that supports Morrison's calculation of the food cost/price ratio. Price increases proposed by Morrison to maintain this food cost/price ratio are subject to the approval of the Hospital. Morrison agrees to provide the Hospital with at least ten (10) business days notice prior to increasing prices. However, if the Hospital elects not to approve a price increase that is necessary for Morrison to maintain the foregoing food cost/price ratio, then the parties will either mutually agree on operational changes that will assist Morrison in accounting for the additional costs it is incurring (e.g. changing portion sizes or menu items) or mutually agree on an adjustment to the Department's actual net cost to account for the additional costs being incurred by Morrison when the parties compare the Department's actual net cost to the Guaranteed Net Cost Budget. If these or any other assumptions upon which the Guaranteed Net Cost Budget was based turn out to be different from Morrison's actual experience, then the Department's actual net cost shall be adjusted accordingly to reflect these differences from the original assumptions. Should Morrison not be allowed to conduct such operations as it determines in the best interests of efficiency and other objectives, then Morrison may request in writing that corresponding charges will be paid by Hospital, or appropriate adjustments shall be made by Morrison and Hospital to the Guaranteed Net Cost Budget, the Department's actual net cost or other applicable financial terms of this Agreement.

VII.    Expenses related to non-controllable, unavoidable or unbudgeted items and events that are not otherwise specifically addressed in the Guaranteed Net Cost Budget shall result in an appropriate adjustment to the Guaranteed Net Cost Budget or the actual net costs incurred by the Department. By way of example and not limitation, if electrical or equipment failure causes the loss of refrigerated or frozen

24

**Confidential and Proprietary**

products, the costs incurred with replacing those items shall be excluded from the Department's actual net cost for the purpose of comparing the Department's actual net cost to the Guaranteed Net Cost Budget. Morrison's budget is based on permanentware service, so if permanentware service is not available (e.g., the dishmachine becomes inoperable), then the additional costs of using disposables will be excluded from the Department's actual net cost for the purpose of comparing the Department's actual net cost to the Guaranteed Net Cost Budget. Additional costs incurred by Morrison to provide the Services during a force majeure event shall also be excluded from the comparison of the Department's actual net costs to the Guaranteed Net Cost Budget. Morrison will make reasonable efforts to document additional costs within a reasonable time frame after event.

VIII. (a) The parties have not budgeted any labor costs for the purpose of the budget that is attached hereto as Exhibit E. Notwithstanding this fact, the parties have agreed that subject to the terms of this Section IX they will account for additional costs to the Hospital for excess Hourly Personnel productive labor hours used by Morrison or for savings created by Morrison in connection with a reduction in the number of productive labor hours used by Morrison.

(b) Subject to paragraph VIII(e), Morrison has agreed to operate the Department for the North Site with 79.3 productive labor hour FTEs (which equals 154,635 annual productive labor hours) and the Department for the South Site with 29.0 productive labor hour FTEs (which equals 56,550 annual productive labor hours). A "productive labor hour FTE" for the purpose of this Agreement shall mean and refer to 1,950 annual productive labor hours of an Hourly Personnel employee in the Department. Productive labor hours shall include hours actually scheduled and worked. Productive labor hours shall not include any non-productive time (e.g., paid time off, vacation pay, jury duty, etc.).

(c) At the end of an applicable calendar year, the parties will calculate the number of productive labor FTEs used by Morrison. If the number of productive labor FTEs for a Site is greater than the projected number of FTEs set forth in paragraph VIII(b) for that Site, then the amount of the Department's actual net cost will be increased for the purpose of comparing the Department's actual net cost to the Guaranteed Net Cost Budget. If the number of productive labor FTEs is less than the projected number of FTEs set forth in paragraph VIII(b) for that Site, then the amount of the Department's actual net cost will be decreased for the purpose of the comparison. The amount of the increase or decrease will be calculated in accordance with paragraph VIII(d).

(d) Subject to paragraph VIII(e), the amount of any increase or decrease to the Department's actual net cost for productive labor at the North Site will be equal to $25.15 (the $18.49 average hourly wage of the Department Hourly Personnel at that Site plus 36% of those wages for associated payroll costs such as payroll taxes, insurance and fringe benefits) multiplied by the difference between the actual number of productive labor hours used by Morrison (1,950 times the actual number of productive labor FTEs) and 154,635 productive labor hours (which is the projected number of annual productive labor hours for the North Site). Subject to paragraph VIII(e), the amount of any increase or decrease to the Department's actual net cost for productive labor at the South Site will be equal to $23.80 (the $17.50 average hourly wage of the Department Hourly Personnel at that Site plus 36% of those wages for associated payroll such as payroll taxes, insurance and fringe benefits) multiplied by the difference between the actual number of productive labor hours used by Morrison (1,950 times the actual number of productive labor FTEs). For example, if the number of productive labor FTEs at the South Site was 29.5 (which equals 57,525 productive labor hours), then the amount of the increase in the Department's actual net cost because Morrison exceeded the budgeted number of FTEs would be $23,234.25 ($23.80 times 975 productive labor hours, which is the difference between actual productive labor hours (57,525) and projected productive labor hours (56,550)).

(e) Morrison will not be responsible for additional productive labor hours that are incurred due to circumstances beyond Morrison's control such as a force majeure event; changes in scope of service (e.g., changes in tray passing responsibility; opening of additional buildings or wings; material increases

25

**Confidential and Proprietary**

in census; etc.). In addition to the foregoing, the 79.3 productive labor hour FTE labor figure for the North Site and the 29.0 productive labor hour FTEs for the South Site includes 2.6 FTES based on the Hospital's typical amount of catering volume. However, the productive labor FTE benchmarks for the North Site and the South Site does not include dedicated labor for catered events or additional productive labor hours necessary to account for a material increase in catering volume (defined as ten percent (10%) more). Dedicated labor shall mean productive labor hours incurred by the Hourly Personnel in excess of the regularly scheduled 2.6 hourly personnel FTEs because work could not be performed by the Hourly Personnel during Morrison's standard work schedule and staffing patterns. For example, dedicated labor includes additional, non-regularly scheduled straight time or overtime necessary for Morrison to provide services at special functions that take place after regular business hours. Dedicated labor will not include catered events during business hours that can be handled adequately under Morrison's standard work schedule and staffing patterns. The parties will mutually agree in writing on a procedure to account for additional productive labor hours that are incurred due to circumstances beyond Morrison's control; due to the use dedicated labor for catered events; or due to material increases in the Hospital's catering usage so that Morrison is not penalized for the additional productive labor hours used by Morrison when one or more of those circumstances arise.

26

| | 2010 Budget | Comments |
|---|---|---|
| **Food & Related Supplies** | $3,346,643 | See Schedule 2 |
| | | |
| **Direct Expenses** | | |
| Paper | 345,851 | |
| Chemicals & Supplies | 59,164 | |
| Office Supplies | 10,385 | |
| Menus | 10,543 | |
| Replacements-China/Silverware/Glassware | 42,485 | |
| Linen | 0 | |
| Uniforms | 0 | |
| Tray System Rental | 0 | South Campus |
| Pest Contract | 1,838 | South Campus |
| Maintenance Contacts | 0 | D&L Service Contracts - Hospital Pays |
| Repairs | 130,154 | |
| Freedom Pay Service Fee | 5,208 | North Campus |
| CBORD Fee | 0 | North Campus |
| Telephone | 2,675 | |
| Postage | 1,310 | |
| Smallwares | 20,770 | |
| Nourishment & Floorstock Paper | 7,205 | |
| Marketing | 8,187 | |
| Patient Education Materials | 5,193 | |
| Management Travel & Education | 10,543 | |
| Clinical Travel & Education | 8,025 | |
| Dues & Subscriptions | 4,125 | |
| Licenses & Permits (other than Alcohol) | 1,888 | |
| General & Product Liability Insurance | 89,526 | |
| Miscellaneous Kitchen & Catering | 6,294 | |
| Horizon POS Maintenance | 3,500 | |
| Data Quest Security System Maintenance | 2,000 | |
| Computer Support Charge | 2,160 | |
| Microsoft Software Licenses | 1,536 | |
| Webtrition Food Production System Support | 2,040 | |
| Steritech Audit | 1,200 | |
| Credit Card Fees | 0 | |
| Capital Investment $600K | 85,714 | |
| | | |
| **Total Direct Expenses** | $969,311 | |
| | | |
| **Morrison's Labor** | | |
| Wages | $1,301,000 | |
| Benefit Cost | $553,315 | Includes Tax / Fringe on all Mgmt. & Clinical |
| Benefit Rate | 42.53% | |
| | | |
| **Total Morrison's Labor** | $1,854,315 | |
| | | |
| **Morrison's Fees** | | |
| | | |
| Administration Fee | 171,200 | |
| Management Fee | 68,000 | |
| | | |
| **Total Morrison's Fees** | $239,200 | |
| | | |
| **Total Cost** | $6,309,469 | |
| | | |
| Less Café Net Revenue | $2,203,556 | |
| | | |
| **Net Cost** | $4,105,914 | |
| | | |
| Patient Days | 210,368 | |
| Patient Day Variable Rate | $6.14 | |
| | | |
| **SIUH Productive FTE's** | | |
| Productive FTE's - North Site | 79.32 | |
| Productive FTE's - South Site | 29.00 | |
| | | |
| **Total SIUH Productive FTE's** | 108.33 | |

**Confidential and Proprietary**

C:\USERS\PHILLM01\DOCUMENTS\2009 WORK FOLDER\STATEN ISLAND UNIVERISTY HOSPITAL FEE WITH INCENTIVE CONTRACT 12.30.09 V.2 CLEAN.DOC

Analysis

| Patient Food Cost | North | South | Total Days | Meal Factor | Meals | Food Cost/Meal | Total Tray Cost |
|---|---|---|---|---|---|---|---|
| Acute Days | 144,182 | 43,570 | 187,752 | 2.569 | 482,364 | | 978,803 |
| Psych Days | 10,344 | 12,271 | 22,615 | 2.651 | 59,963 | | 143,191 |
| Totals | 154,526 | 55,841 | 210,368 | | 542,327 | | 1,121,994 |
| Patient Tray Food Cost | 1,121,994 | | | | | | |

| Patient Non-Tray Cost | Patient Days | Cost/Day | Cost |
|---|---|---|---|
| Nourishments - Acute & Psych | 210,368 | | 163,098 |
| Nourishments - Psych | | | |
| Floor Stocks - Acute & Psych | 210,368 | | 382,722 |
| Floor Stocks - Psych | | | |
| Supplements Acute & Psych | 210,368 | | 96,305 |
| Total Patient Non Tray Food & Related Cost | | | 642,127 |
| Total Patient Food Cost | | | 1,764,120 |

| Non-Patient Cost | | | |
|---|---|---|---|
| Out Patient Trays | | | |
| ER - includes all areas below | 52,227 | | |
| Endoscopy | | | |
| Dialysis | | | |
| Ambulatory | | | |
| Cardiac Cath | | | |
| Radiology | | | |
| L&D | | | |
| Extra Trays | | | |
| Guest Trays | | | |
| Total Trays | 26,158 | | |
| Cost/Out-Patient Tray | | | |
| Total Cost for Out-Patient Trays | $ 52,227 | | |

| Cafeteria Food Cost | Revenue | F/C % | Total Food Cost |
|---|---|---|---|
| Cafeteria Cash Sales | $2,134,933 | 38.475% | |
| Doctor Revenue - Charge Sales | $66,623 | 38.475% | |
| | | 38.475% | 847,816 |
| Total Non-Patient Food & Related Cost | | | 1,682,523 |
| Total Food & Related Cost | | | 3,346,643 |

| Free Meals through Cafeteria | Retail Sales | Food Cost % | Food Cost |
|---|---|---|---|
| Free Meals | 357,081 | 38.962% | 139,126 |
| Total Revenue | 357,081 | | |
| Total Cost of Free Meals through Cafeteria | | | 139,126 |

| Kosher Resident Service | | Cost/Meal | Food & Related Cost |
|---|---|---|---|
| Meals | 3,900 | $8.40 | $32,760 |
| Pantry @ Cost | | | $16,744 |
| Total Kosher Resident Service | | | $49,504 |

| Misc. Food & Related Cost | Actual Cost | Comments | |
|---|---|---|---|
| Pantry | 21,074 | | |
| Dietary Employees | 37,240 | Beverages Only | |
| Catering | 266,337 | Based on sales | $632,674 |
| Departmental Req's | 169,199 | Act Cost | |
| Total Misc Food & Related Cost | 493,850 | | |

| Meal Counts | | |
|---|---|---|
| Patient | 542,327 | |
| Out-Patient Trays | 26,158 | |
| Free Meals - Café | 57,409 | |
| Misc Food & Related Cost | 210,149 | |
| Kosher Resident | 3,900 | |
| Café | 354,269 | |
| Total Meals | 1,193,212 | |
| Average cost per meal | 2.80 | |

**Confidential and Proprietary**

**Exhibit F**

### HIPAA BUSINESS ASSOCIATE ADDENDUM

This Addendum, dated as of _____, 2009 ("Addendum"), supplements and is made a part of the Services Agreement (as defined below) by and between Staten Island University Hospital ("Covered Entity") and Morrison Management Specialists, Inc. ("Business Associate"). This Addendum will apply to Morrison to the extent that Morrison is a Business Associate of Covered Entity for the purpose of the Health Insurance Portability and Accountability Act of 1996.

WHEREAS, Covered Entity and Business Associate are parties to the Services Agreement pursuant to which Business Associate provides certain services to Covered Entity. In connection with Business Associate's services, Business Associate creates or receives Protected Health Information from or on behalf of Covered Entity, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 and related regulations promulgated by the Secretary (collectively, "HIPAA") as reasonably necessary to perform the services it provides Covered Entity provided that such use or disclosure would not violate HIPAA or the HIPAA regulations if done by Covered Entity.

WHEREAS, in light of the foregoing and the requirements of HIPAA, Business Associate and Covered Entity agree to be bound by the following terms and conditions:

1.    **Definitions.**

    (a)    General. Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in the Privacy Rule and the Security Rule.

    (b)    Specific.

        (i)    Electronic Protected Health Information. "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR 160.103, limited to the information that Business Associate creates, receives, maintains, or transmits from or on behalf of Covered Entity provided that electronic protected health information are in the care, custody or control of Business Associate.

        (ii)    Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

        (iii)    Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR parts 160 and 164.

        (iv)    Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

        (v)    Required By Law. "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR 164.103.

29

Confidential and Proprietary

      (vi)    Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

      (vii)    Security Rule. "Security Rule" shall mean the Security Standards at 45 CFR parts 160 and 164.

      (viii)    Services Agreement. "Services Agreement" shall mean any present or future agreements, either written or oral, between Covered Entity and Business Associate under which Business Associate provides services to Covered Entity which involve the use or disclosure of Protected Health Information.

**2.    Obligations and Activities of Business Associate.**

    (a)    Use and Disclosure. Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by the Services Agreement or as Required By Law.

    (b)    Appropriate Safeguards. Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by the Services Agreement. Without limiting the generality of the foregoing sentence, Business Associate will:

      (i)    Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information as required by the Security Rule;

      (ii)    Ensure that any agent, including a subcontractor, to whom Business Associate provides Electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect Electronic Protected Health Information; and

      (iii)    Report to Covered Entity any security incident (as defined by the Security Rule) of which Business Associate becomes aware.

    (c)    Mitigation. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

    (d)    Reporting. Business Associate agrees to report to Covered Entity any use or disclosure of the Protected Health Information not provided for by the Services Agreement of which it becomes aware.

    (e)    Agents. Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

    (f)    Access to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by the Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR 164.524.

C:\USERS\PHILLM01\DOCUMENTS\2009 WORK FOLDER\STATEN ISLAND UNIVERSITY HOSPITAL FEE WITH INCENTIVE CONTRACT 12.30.09 V.2 CLEAN.DOC

**Confidential and Proprietary**

(g)    Amendments to Designated Record Sets. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by the Covered Entity.

(h)    Access to Books and Records. Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, in a time and manner designated by the Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(i)    Accountings. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

(j)    Requests for Accountings. Business Associate agrees to provide to Covered Entity or an Individual, in the time and manner designated by the Covered Entity, information collected in accordance with Section 2(i) of this Addendum, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

3.    **Permitted Uses and Disclosures by Business Associate.**

(a)    Services Agreement. Except as otherwise limited in this Addendum, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Services Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity.

(b)    Use for Administration of Business Associate. Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(c)    Disclosure for Administration of Business Associate. Except as otherwise limited in this Addendum, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that disclosures are Required by Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

31

**Confidential and Proprietary**

4.    **Permissible Requests by Covered Entity.** Except as set forth in Section 3 of this Addendum, Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Covered Entity.

5.    **Term and Termination.**

(a)    Term. This Addendum shall be effective as of the date of this Addendum, and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

(b)    Termination for Cause. Upon Covered Entity's knowledge of a material breach of this Addendum by Business Associate, Covered Entity shall either:

(i)    Provide an opportunity for Business Associate to cure the breach or end the violation. If Business Associate does not cure the breach or end the violation within the time specified by Covered Entity, Covered Entity shall terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion;

(ii)    Immediately terminate: (A) this Addendum; (B) all of the provisions of the Services Agreement that involve the use or disclosure of Protected Health Information; and (C) such other provisions, if any, of the Services Agreement as Covered Entity designates in its sole discretion if Business Associate has breached a material term of this Addendum and cure is not possible; or

(iii)    If neither termination nor cure are feasible, Covered Entity shall report the violation to the Secretary.

(c)    Effect of Termination.

(i)    Except as provided in paragraph (ii) of this Section 5(c), upon termination of this Addendum, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

(ii)    In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Addendum to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

6.    **Electronic Transaction Standards.** Business Associate shall, to the extent applicable, comply with all HIPAA standards and requirements (including, without limitation, those specified in 45 CFR Part 162) with respect to the transmission of health information in electronic form in connection with any

32

**Confidential and Proprietary**

transaction for which the Secretary has adopted a standard under HIPAA ("Covered Transactions"), to the extent such electronic Protected Health Information or the information technology systems through which Business Associate creates, receives, maintains or transmits such electronic Protected Health Information are in the care, custody or control of Business Associate;. In addition, Business Associate will make any of its software which it licenses to Covered Entity to perform all or a part of any Covered Transaction compliant with any guides, standards or specifications adopted by Covered Entity's payors regarding Covered Transactions. Business Associate shall comply with all HIPAA and payor standards and requirements by the applicable compliance dates. Business Associate represents and warrants that it is aware of all current HIPAA and payor standards and requirements regarding Covered Transactions, and Business Associate shall comply with any modifications to HIPAA and payor standards and requirements which become effective from time to time. Covered Entity agrees to notify Business Associate of its current payors, upon request. Business Associate agrees that its compliance shall be at its sole cost and expense, which expense shall not be passed on to Covered Entity in any form, including, but not limited to, increased fees. Business Associate shall also require all of its agents and subcontractors (if any) who assist Business Associate in providing its services and/or products to comply with all applicable requirements of HIPAA and Covered Entity's payors.

7.    **Miscellaneous.**

(a)    Regulatory References. A reference in this Addendum to a section in HIPAA means the section as in effect or as amended.

(b)    Amendment. The Parties agree to take such action as is necessary to amend the Services Agreement from time to time as is necessary for Covered Entity to comply with the requirements of the HIPAA. The terms of any such amendments shall be mutually agreed upon by the parties.

(c)    Survival. The respective rights and obligations of Business Associate under Section 5(c) of this Addendum shall survive the termination of the Services Agreement.

(d)    Interpretation. Any ambiguity in this Addendum shall be resolved to permit Covered Entity to comply with HIPAA.

(e)    Miscellaneous. The terms of this Addendum are hereby incorporated into the Services Agreement. Except as otherwise set forth in Section 7(d) of this Addendum, in the event of a conflict between the terms of this Addendum and the terms of the Services Agreement, the terms of this Addendum shall prevail. The terms of the Services Agreement which are not modified by this Addendum shall remain in full force and effect in accordance with the terms thereof. The Services Agreement together with this Addendum constitutes the entire agreement between the parties with respect to the subject matter contained herein. This Addendum may be executed in counterparts, each of which when taken together shall constitute one original.

**IN WITNESS WHEREOF**, the parties have executed this Addendum as of the date set forth above.

**STATEN ISLAND UNIVERSITY HOSPITAL**

**MORRISON MANAGEMENT SPECIALISTS, INC.**

33

## Confidential and Proprietary

By: _[signature]_

Name: Donna Proske
Title: Executive VP, and C.O.O

By: _[signature]_

Name: Scott Neil MacLellan
Title: CEO

34